**United States District Court**
**District of Massachusetts**

```
_____
                              )
SCOTT ROSE,                   )
         Plaintiff,           )
                              )
         v.                   )      Civil Action No.
                              )      08-10050-NMG
KATHLEEN M. DENNEHY, LOIS RUSSO, )
DAVID DARLING, ROBERT BASSETT, )
WAYNE MARTIN, MARK MCCAW, JAMES )
HART and UNNAMED CORRECTIONAL  )
OFFICERS, all in their personal )
and official capacities, and  )
DEPARTMENT OF CORRECTION,      )
         Defendants.          )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

Scott Rose ("Rose"), a Massachusetts state prisoner, has brought suit against the Massachusetts Department of Correction ("DOC") and several corrections officers alleging various federal and state statutory violations and common law claims arising from the alleged excessive use of force by corrections officers.

## I.   Background

The following facts are as asserted in the parties' Rule 56 statements and supporting documentation.  Factual disputes exist where noted.

Rose, an American citizen of Cape Verdean descent, is lawfully incarcerated in the custody of the Commonwealth of Massachusetts pursuant to a valid conviction of murder in the

-1-

second degree and related gun charges in 1995.  He is serving a life sentence.  Rose is six feet, three inches tall, weighs approximately 250 pounds and practices boxing and weightlifting. Rose has a history of in-patient commitments to state mental hospitals related to incidents of self-mutilation and attempted suicide.  He has been diagnosed with poor impulse control and has taken psychiatric medication for years.

On January 11, 2005, Rose was transferred from the Massachusetts Correctional Institution in Norfolk, Massachusetts, a medium security facility, to the Souza Baranowski Correctional Center ("SBCC"), a maximum security facility in Shirley, Massachusetts.  Before his transfer, he had refused to eat for several days.[1]  Upon arrival at SBCC, Rose was assigned to a cell in the Special Management Unit ("SMU"), L3.  Rose continued to refuse food.

The SMU is a segregation unit that houses inmates who have a history of violent or disruptive behavior or who are awaiting a serious disciplinary matter.  The L3 SMU consists of 32 single-inmate cells, each with a solid steel door with one window.  The door is the only entrance and exit to each cell.  Inmates cannot leave their cells unless escorted by at least two officers and must be handcuffed before the door is opened.

---

[1] Defendants assert that Rose was participating in a "hunger strike" but Rose responds that he simply refused to eat because of hygiene concerns.

On January 18, 2005, Rose was housed in cell #27 in the L3 SMU.  At approximately 7:00 a.m., SBCC corrections officers Wayne Martin ("Martin"), Robert Bassett ("Bassett") and Sergeant David Darling ("Darling") were alerted by an emergency radio call (called a "Code 99") to a medical situation in Rose's cell.  The officers peered through the door window of Rose's cell and observed Rose lying on the floor.  They called out to Rose but he did not respond.  From the window, the officers saw superficial scratches on Rose's back and blood on the floor.  Once Sergeant Darling (the highest-ranking officer on duty) determined that there were enough officers to ensure safety, he requested that the door be opened electronically.[2]  When the officers entered the cell, Rose was lying motionless on the floor.

The parties dispute the subsequent series of events.  The officers assert that, after unsuccessfully attempting to arouse Rose, they applied leg and wrist restraints which caused him to "rant and rave," shout obscenities and accuse them of abuse.  The officers ordered Rose to stand and, when he refused, they carried him out of the cell and placed him on a gurney.  After Rose was briefly examined by two nurses, the officers wheeled him to the Health Services Unit.  The officers contend that they entered Rose's cell with the intention of helping him and did not strike,

---

[2] In the SMU, a cell door can be opened in either of two ways, electronically (by central command in the Control Room) or manually (which records on the server as an "alarm breach").

kick, verbally abuse or otherwise mistreat him.  They insist
that, throughout the incident, they followed proper DOC
procedures.

Rose, on the other hand, describes a quite different scene.
He asserts that when the officers entered his cell, they
physically assaulted him and made racially derogatory slurs.  For
example, Rose states that Darling referred to himself as David
Duke (a prominent white supremacist) and wished Rose a "Happy
Martin Luther King Day".  Rose also asserts that the officers
(and Darling in particular) pushed him to the ground, punched him
in the face, kicked his body and whipped his back with an
unidentifiable object.  Later that day, Rose was taken to
Leominster Hospital where he was treated for various injuries
including left shoulder and right rib-cage contusions, lash marks
on his back and a left cheek laceration.

On January 21, 2005, Rose filed an Inmate Grievance Form
alleging that he had been beaten by several corrections officers
between roughly 2:00 a.m. and 5:00 a.m. on January 18, 2005.  His
grievance was referred to the Office of Investigative Services,
the DOC's internal affairs unit and was assigned to Sergeant Mark
McCaw ("McCaw"), a special investigator.  As part of the
investigation, McCaw and his team interviewed Rose and several
other inmates in the L3 SMU, reviewed surveillance videotapes,
conducted a forensic evaluation and performed a polygraph

examination of Rose.  Based on the evidence he gathered, McCaw concluded that Rose had fabricated the incident.  Rose, of course, disputes that conclusion.

During Rose's interview with McCaw, Rose stated that, around 3:00 a.m. on January 18, 2005, his cell door was opened and he was verbally harassed and beaten by several officers.  The officers made derogatory racial remarks, led Rose to the bed like a dog and whipped him.  Rose passed out sometime thereafter and did not awake until around 7:00 a.m. when he was discovered in his cell.

Several inmates in adjacent cells were also interviewed but did not corroborate Rose's story.  As Rose points out, however, the investigative team did not interview all of the inmates housed near Rose's cell.  Several inmates who were not interviewed have provided sworn affidavits stating that they heard screaming coming from Rose's cell and saw officers walking in and out.

Electronic data provided by an SBCC engineer reveals that the door to cell #27 was closed at all times between 11 p.m. on January 17, 2005, and 7:11 a.m. on January 18, 2005.  The door was open, however, between 7:11 a.m. and 7:46 a.m.

McCaw also reviewed the surveillance tapes from the January 17/18, 2005, overnight shift and determined that no one entered Rose's cell that night.  There was, however, a gap in the

-5-

videotape at approximately 7:00 a.m., although a DOC electronic technician has explained that the surveillance tapes are changed every morning at that time.  The Court is not informed whether the new surveillance tape (i.e., the tape that began recording after 7:00 a.m.) was reviewed or what its contents reveal.  Rose contends that the recording he was provided cuts off at precisely the time the defendants entered his cell.  The officers state that they did not bring a hand-held video camera into Rose's cell for the Code 99, although a neighboring inmate asserts that he saw one of the officers carrying a camera.

A chemist from the State Police crime lab performed a forensic evaluation of Rose's cell.  Several items tested positive for the presence of blood including a headphone wire and jack from a Walkman radio belonging to Rose.  McCaw's report notes that the size and shape of the lash wounds on Rose's back correspond with the size and shape of the headphones and jack. McCaw also examined the photographs of Rose taken on the date of the alleged assault and observed that blood had dried down Rose's back in a vertical pattern.  McCaw took this to mean that Rose was likely standing when he incurred the back injuries, not crawling on all fours as he alleges.  Rose disputes McCaw's conclusion regarding the pattern of dried blood.  He also contends that the items of personal property tested as part of the forensic evaluation were not properly preserved from the time

of the incident to the time of the testing (three days later).

Finally, during the polygraph examination, Rose denied inflicting the injuries on himself.  The results of the examination indicate that his response was "deceptive".  Although Rose admits that he underwent a polygraph test and denied injuring himself, he disputes the validity and conclusiveness of the results.

On April 6, 2005, Rose was charged in a disciplinary report with making false allegations of assault.  A hearing was conducted on April 14, 2005, and, after considering the evidence, the hearing officer, James Hart ("Hart"), found Rose guilty of 1) lying and disobeying an order, 2) violating DOC rules, 3) disruptive conduct, 4) self-mutilation and 5) violating the law and attempting to commit an offense.  Rose was sanctioned with 15 days of isolation and suspension of privileges.  Rose's appeal was denied on May 11, 2005.

## II.  **Procedural History**

On January 14, 2008, Rose filed a ten-count complaint against the DOC and various individual defendants, including Kathleen Dennehy ("Dennehy"), former DOC Commissioner, Lois Russo ("Russo"), former Superintendent of SBCC, and DOC corrections officers Darling, Bassett, Martin, McCaw and Hart (as well as other "unnamed" officers), all in their official and personal capacities.  The complaint states various claims for 1)

-7-

constitutional violations pursuant to the federal civil rights statute, 42 U.S.C. § 1983, 2) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, 3) violations of Massachusetts statutory law and 4) several intentional torts.

On February 1, 2010, after the close of discovery, the defendants (all represented by the same counsel), moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) or, in the alternative, for summary judgment on all of the plaintiff's counts.

Rose filed an opposition on March 8, 2010, in which he consented to the dismissal of several counts but argued that genuine issues of material fact precluded summary judgment on the others. Specifically, Rose voluntarily dismissed Counts I, III and VI in their entirety, Counts IV and V as to defendants Dennehy and Rose and Counts II, VIII and IX as to the "unnamed correctional officers". Rose also agreed to dismiss all allegations arising out of a separate incident that occurred on January 12, 2005, and the Court has limited its consideration of the dispute accordingly.

At this juncture, therefore, the following alleged claims remain contested:

1)      Violations of the Eighth and Fourteenth Amendments against Officers Darling, Bassett and Martin (Count II);

2)    Civil RICO claim against Officers Darling, Bassett, Martin, Hart and McCaw (Count IV);

3)    Conspiracy to violate Civil Rights against Officers Darling, Bassett, Martin, Hart and McCaw (Count V);

4)    Violation of the Massachusetts Civil Rights Act ("MCRA"), against all individual defendants (Count VII);

5)    Assault and Battery against Officers Darling, Bassett and Martin (Count VIII);

6)    Intentional Infliction of Emotional Distress ("IIED") against Officers Darling, Bassett, Martin, Hart and McCaw (Count IX); and

7)    Negligence under the Massachusetts Tort Claims Act ("MTCA") against the DOC (Count X).[3]

The Court addresses each of those counts <u>seriatim</u>.

## III. <u>Analysis</u>

### A.    **Legal Standard**

#### 1.    **Motion for Judgment on the Pleadings**

Some of the defendants' arguments are directed to a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). A Rule 12(c) motion is treated similarly to a Rule 12(b)(6) motion. <u>Pérez- Acevedo</u> v. <u>Rivero-Cubano</u>, 520 F.3d 26, 29 (1st Cir. 2008). To survive such a motion, the complaint must contain factual allegations that "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544,

---

[3] The MTCA claim is mislabeled as Count IX in the Complaint but will be referred to in this Memorandum as Count X to avoid confusion with the IIED count (also labeled Count IX).

555 (2007).  The Court must also view the facts presented in the
pleadings and all reasonable inferences to be drawn therefrom in
the light most favorable to the nonmoving party.  R.G. Fin. Corp.
v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006).

### 2.   Motion for Summary Judgment

In the alternative, the defendants move for summary
judgment.  The role of summary judgment is "to pierce the
pleadings and to assess the proof in order to see whether there
is a genuine need for trial."  Mesnick v. General Elec. Co., 950
F.2d 816, 822 (1st Cir. 1991)(quoting Garside v. Osco Drug, Inc.,
895 F.2d 46, 50 (1st Cir. 1990)).  The burden is upon the moving
party to show, based upon the pleadings, discovery and
affidavits, "that there is no genuine issue as to any material
fact and that the moving party is entitled to a judgment as a
matter of law."  Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the
suit under the governing law."  Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant
or unnecessary will not be counted."  Id.  A genuine issue of
material fact exists where the evidence with respect to the
material fact in dispute "is such that a reasonable jury could
return a verdict for the nonmoving party."  Id.

Once the moving party has satisfied its burden, the burden
shifts to the non-moving party to set forth specific facts

showing that there is a genuine, triable issue.  Celotex Corp. v.
Catrett, 477 U.S. 317, 324 (1986).  The Court must view the
entire record in the light most hospitable to the non-moving
party and indulge all reasonable inferences in that party's
favor.  O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).
If, after viewing the record in the non-moving party's favor, the
Court determines that no genuine issue of material fact exists
and the moving party is entitled to judgment as a matter of law,
summary judgment is appropriate.

### B.   Application

#### 1.   Federal Constitutional and Statutory Claims

Counts II and V assert deprivations of constitutional rights
in violation of 42 U.S.C. § 1983.  To prevail on a Section 1983
claim, Rose must prove that his constitutional rights were
violated by a person or persons acting under color of state law.
Soto v. Flores, 103 F.3d 1056, 1061-1062 (1st Cir. 1997).
Because the corrections officers do not dispute that they were
acting under color of law, the Court's focus is whether their
conduct deprived Rose of rights secured by the Constitution or
federal law.

Count IV asserts a violation of the Racketeer Influenced and
Corrupt Organizations Act, codified at 18 U.S.C. §§ 1961-1968.

a.  **Eighth Amendment Violations: Officers
Darling, Bassett and Martin (Count II)**

i.  **Factual Disputes**

In Count II, Rose asserts that, on January 18, 2005,
Officers Darling, Bassett and Martin assaulted him without
justification and in violation of the Eighth Amendment's
prohibition against cruel and unusual punishment.

The Eight Amendment of the United States Constitution
affords prisoners the right to be free from "unnecessary and
wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319
(1986).  When prison officials stand accused of using excessive
physical force, the "core judicial inquiry" is whether that force
"was applied in a good-faith effort to maintain or restore
discipline, or maliciously and sadistically to cause harm."
Hudson v. McMillan, 503 U.S. 1, 6 (1992).  A corrections officer,
acting under the color of law, may also be liable for failing to
prevent the use of excessive force by another officer. See,
e.g., Clark v. Taylor, 710 F.2d 4, 9 (1st Cir. 1983).

The defendants contend that the factual record cannot
support Rose's Eighth Amendment claim and they are entitled to
summary judgment.  The evidence proffered by the defendants
suggests that on January 18, 2005, Officers Darling, Bassett and
Martin responded to an emergency Code 99 call, observed Rose
lying motionless on the floor of his cell and entered the cell to
render aid to him.  When Rose did not respond, the officers

-12-

applied wrist and leg restraints, causing Rose to shout obscenities and accuse the officers of abusing him.  When Rose refused to stand up, the officers picked him up, carried him out of his cell on a gurney and wheeled him to the Health Services Unit.

The officers maintain that, during their entire contact with Rose, they never used excessive force or inflicted pain in a wanton or sadistic manner.  They insist, rather, that Rose self-inflicted the wounds and that they merely came to his aid.  The officers' version of the events is corroborated by the investigation conducted by Officer McCaw, including the forensic evaluation of Rose's cell, the polygraph examination of Rose and the electronic surveillance records (all of which are discussed in detail in the factual background).

Rose has, however, presented evidence that calls the defendants' story into question.  The record reveals that the door to Rose's cell was open between 7:11 a.m. and 7:46 a.m. on the morning of January 18, 2005, and that Officers Darling, Bassett and Martin entered.  The contents of the video surveillance tape for that time period (if such a tape exists) is unavailable.  Officer McCaw asserts that he reviewed the surveillance tapes of the 11:00 p.m. to 7:00 a.m. shift but does not state whether he reviewed the tapes of the 7:00 a.m. to 3:00 p.m. shift.  Rose insists that there is a break in the

-13-

surveillance tape that precisely corresponds with the time of the Code 99 incident.  That gap may simply be the product of a routine change in the videotape but its timing is disturbingly coincidental.  It is also unclear if the officers brought a hand-held video camera into the cell and, if so, whether it was used and/or what it reveals.

When Rose was carried out of the cell on a gurney, his injuries were serious enough that he had to be taken to an outside hospital.  The hospital report indicates that he sustained a possible left shoulder dislocation, right rib-cage contusions, lash marks on his back and a left cheek laceration.  Many of those injuries are visible in a series of photographs submitted by Rose.  The Court may draw inferences regarding the appropriateness of the officers' use of force by the extent of Rose's injuries.  Hudson, 503 U.S. at 7; Orwat v. Maloney, 360 F. Supp. 2d 146, 154 (D. Mass. 2005).

Sworn affidavits from three neighboring inmates also provide support for Rose's claim.  Inmate #1 indicates that he witnessed Bassett and other officers walking in and out of Rose's cell "with their sleeves rolled up and sweating."  He also states that he heard Rose screaming, "what is this, beat up a nigger day?" and then observed Rose being removed from his cell.  Finally, Inmate #1 notes that he and another inmate (both of whom have direct views of Rose's cell) requested to be interviewed by the

investigative officers but were never questioned.

Inmate #2 states he heard 1) a "boom boom" noise, 2) Officer Darling screaming at two nurses to get out of the way and 3) Rose screaming at officers to stop kicking him.  Finally, Inmate #3 asserts that he was awakened by Rose's screams and observed Darling outside of Rose's cell with his sleeves rolled up and breathing heavily.  Although the inmates' reports do not necessarily contradict the defendants' version of the events, they tend to corroborate the plaintiff's claims.

As the defendants suggest, Rose initial's claim that he was assaulted sometime between 2:00 a.m. and 5:00 a.m. on January 18, 2005, is inconceivable given that the door to Rose's cell remained closed during that entire period.  If, however, Rose was knocked unconscious from the alleged beatings as he claims, it is feasible that he passed out briefly and awoke several minutes later believing that hours had passed.  Thus, Rose's error in timing does not conclusively bar his claim.  Whether his story is truthful is for a jury to consider when weighing the evidence.

In sum, although the evidence in support of Rose's claim is underwhelming, the Court concludes that Rose has created a triable issue.

### ii.  Qualified Immunity

The officers further argue that they are protected from suit under the doctrine of qualified immunity.  That doctrine serves

to protect officers from liability in Section 1983 suits when their

> conduct does not violate clearly established statutory
> or constitutional rights of which a reasonable person
> would have known.

Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  The hallmark of qualified immunity is whether the officer's conduct was objectively reasonable, assessed in light of the legal rules that were clearly established at the time that his action was taken. See Pearson v. Callahan, 129 S. Ct. 808, 816 (2009).

The doctrine of qualified immunity cannot shield the corrections officers from suit.  The Eighth Amendment's proscription against the infliction of cruel and unusual punishment was clearly established at the time of the incident and a reasonable officer would have known that an unprovoked assault on an inmate violated that right.  Cf. Hope v. Pelzer, 536 U.S. 730, 741-45 (2002) (cuffing inmate to hitching post violates clearly established right to be free from cruel and unusual punishment).  Thus, count II will proceed against the officers but in their personal capacities only pursuant to the long-standing rule that civil rights claims cannot be brought against public employees in their official capacities.  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (sovereign immunity bars suits against state officials in their official capacity, as that would be akin to suing the state itself).

-16-

b.   **Conspiracy to violate Civil Rights: Officers Darling, Bassett, Martin, Hart and McCaw (Count V)**

In Count V, Rose alleges that Officers Darling, Bassett, Martin, Hart and McCaw engaged in a conspiracy to violate his rights under the First, Eighth and Fourteenth Amendments by bringing false disciplinary charges against him, submitting false evidence to corroborate those charges and altering a security videotape to cover up their wrongdoing.  To succeed on a claim of conspiracy under Section 1983, Rose must prove both a conspiratorial agreement and an actual deprivation of rights. Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001); Langdrian v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980).

Even assuming that Rose's version of the events is true, his conspiracy claim fails because he has not established that the challenged actions violate a federally secured right.  Prison inmates have no constitutionally guaranteed immunity from false accusations of misconduct.  Orwat, 360 F. Supp. at 157.  So long as the inmate has been provided a disciplinary hearing with adequate procedural protections, his constitutional rights have been satisfied.  Id; accord Hanrahan v. Lane, 747 F.2d 1137, 1140 (7th Cir. 1984).  Here, Rose has consented to the dismissal of his claim that the disciplinary hearing violated his procedural due process protections (Count VI), leaving the Court no basis on which to find that those rights were violated.  Although his

-17-

Eighth Amendment claim is still viable, he has neither alleged nor adduced any evidence that the defendants conspired <u>before</u> the assault to deprive him of his rights.  Instead, his allegations of conspiracy focus exclusively on the officers' subsequent purported cover-up.

Rose offers no direct evidence of a conspiratorial agreement, arguing that circumstantial evidence suffices to establish its existence.  In particular, he draws the Court's attention to 1) the gap in the surveillance tapes corresponding with the period during which the officers were in his cell, 2) the fact that several inmates with direct views of Rose's cell were not interviewed, 3) the forensic investigators' purported failure properly to preserve the scene of the incident and 4) the tight-knit relationship between the corrections officers and their motivation to cover up an assault.  Although this circumstantial evidence might support an inference of conspiracy, the Court need not resolve that issue given its conclusion that summary judgment on the conspiracy count is warranted on the previously-stated grounds.

> ### c.   Civil RICO Claim: Officers Darling, Bassett, Martin, Hart and McCaw (Count IV)

The civil enforcement scheme of the Racketeer Influenced and Corrupt Organizations Act allows "[a]ny person injured in his business or property by reason of a violation of section 1962" to bring suit.  18 U.S.C. § 1964(c).  A valid claim based upon a

violation of § 1962(c) entails 1) conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity.  E.g., Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 233 (1st Cir. 2003) (citation and quotation marks omitted).  A "pattern" requires at least two predicate acts of racketeering activity, id., and racketeering activity, in turn, covers a wide range of unlawful conduct including, inter alia, bribery, extortion and fraud.  See 18 U.S.C. § 1961(1) (containing exhaustive list of racketeering activities).

The enterprise alleged by the plaintiff must be "more than an informal group created to perpetuate the acts of racketeering," United States v. Bledsoe, 674 F.2d 647, 663 (8th Cir. 1982), and distinct from the acts which form the pattern of racketeering activity in which it engages.  United States v. Turkette, 452 U.S. 576, 583 (1981).  A plaintiff lacks standing to bring a RICO claim unless he can show that he was directly "injured in his property or business by the conduct constituting the violation."  Sedima S.P.R.L. v. Imrex, 473 U.S 479, 496 (1985); accord 18 U.S.C. § 1964(c).

Rose's RICO claim is hopelessly flawed.  His allegations are vague and conclusory and he does not plead specific facts to support each of the four requisite elements.  He neglects to identify the specific subsections of Section 1962 the defendants allegedly violated, invoking instead (and only superficially) his

right to sue under Section 1964. More importantly, the alleged
predicate acts (e.g., planting evidence and altering the security
videotape) do not fall within the proscribed "racketeering"
activities set forth in Section 1961(1). Finally, Rose does not
allege facts that establish the existence of an identifiable and
organized ongoing criminal enterprise or a coordination of
criminal activity among the individual officers.

Also fatal to Rose's RICO claim is his failure to allege an
actionable injury to his business or property. His allegation
that he was "obliged to spend money to retain the services of
legal counsel to represent his interests" is simply a claim for
incidental damages and does not constitute a legally cognizable
injury under the RICO statute. See Rylewicz v. Beaton Svcs.
Ltd., 698 F. Supp. 1391, 1397 (N. D. Ill. 1988) (pecuniary losses
incurred in investigating defendants' conduct is non-
compensable); Local 355, Hotel, Motel, Restaurant & Hi-rise
Employees and Bartenders Union v. Pier 66 Co., 599 F. Supp. 761,
765 (S.D. Fl. 1984) (finding no RICO claim where only alleged
injuries were attorneys fees and costs). Accordingly, Count IV
will be dismissed.

### 3. State Law Claims

#### a. Violation of the MCRA: All Individual Defendants (Count VII)

The Massachusetts Civil Rights Act affords a private right
of action for protection against interference

-20-

> by threats, intimidation or coercion ... with the
> exercise or enjoyment of rights secured by the
> constitution or laws of the United States.

M.G.L. c. 12 §§ 11H, 11I; Deas v. Dempsey, 530 N.E.2d 1239, 1240

(Mass. 1988).  Crucially, a plaintiff must show not only

infringement of a constitutional right but that the infringement

was accomplished by threats, intimidation or coercion.  Armstrong

v. Lamy, 938 F.Supp. 1018, 1042 (D. Mass. 1996); Sena v.

Commonwealth, 629 N.E.2d 986, 993 (Mass. 1994).  Thus, even

unlawful conduct does not violate the MCRA when "all it does is

take someone's rights away directly."  Longval v. Commissioner of

Correction, 535 N.E.2d 588, 593 (Mass. 1989).

Here, Rose alleges that in the early morning of January 18,

2005, various DOC officers entered his cell, made verbal threats

and assaulted him.  Specifically, he asserts that Officer Darling

called himself "David Duke" and wished Rose a "Happy Martin

Luther King Day."  Even accepting Rose's contention that those

comments were intimidating or coercive, he has not established

the requisite "nexus" between those threats and the deprivation

of his rights.  Columbus v. Biggio, 76 F. Supp. 2d 43, 54 (D.

Mass. 1999).  Rose has alleged, at most, "deprivations and

threats, not deprivations by threats."  Id. (emphasis added).

Count VII fails as a matter of law.

b.   **Assault and Battery: Officers Darling, Bassett and Martin (Count VIII)**

i.   **Factual Disputes**

Under Massachusetts law, an assault and battery is "the intentional and unjustified use of force upon the person of another." Thore v. Howe, 466 F.3d 173, 176 (1st Cir. 2006) (quoting Commonwealth v. Burno, 487 N.E.2d 1366, 1368-69 (Mass. 1986)).  Rose's alleged assault and battery arises from the same facts underlying his Eighth Amendment claim.  He alleges that the officers struck him in the face, neck and back and kicked his body without provocation.  As a result of the defendants' purported misconduct, Rose suffered severe injuries requiring immediate medical treatment.

The officers move for summary judgement on this count on the grounds that their use of force was reasonably necessary to render medical aid and to preserve order and security.  See 103 C.M.R. 505.07 (permitting corrections officer to use physical force under certain circumstances).  To overcome the officers' defense of privilege, Rose must show that their actions rise to the level of excessive or unjustified force.  See Mercado v. McCarthy, 2009 WL 799465, at *3 (D. Mass. Mar. 25, 2009); Rose v. Town of Concord, 971 F. Supp. 47, 51 (D. Mass. 1997).

As discussed in detail with respect to Rose's Eighth Amendment claim, genuine issues of material fact exist as to whether the corrections officers assaulted and battered Rose

without justification or merely responded to a medical emergency.
As such, summary judgment on Rose's assault and battery claim is
inappropriate.

### ii.  Officers' Immunity

The officers are not entitled common law immunity with
respect to Rose's tort claim.  Generally, immunity is warranted
where an official has acted within the scope of a discretionary
public duty, in good faith and without malice or corruption.
Gildea v. Ellershaw, 298 N.E.2d 847, 858-59 (Mass. 1973).  Here,
however, because there is evidence from which to infer that the
officers acted in bad faith or with malice, they are not shielded
from tort liability.  Cf. Breault v. Chairman of the Bd. of Fire
Comm'rs of Springfield, 513 N.E.2d 1277, 1282 (Mass. 1987)
(finding no immunity for intentional ministerial acts of public
officials).

As with his Section 1983 claim, Rose's state law claim for
assault and battery is barred against the officers in their
official capacities.  Although Massachusetts has waived its
sovereign immunity with respect to the negligent or wrongful acts
and omissions of its employees, M.G.L. c. 258, § 2, that waiver
does not apply to claims arising out of intentional torts such as
assault and battery.  M.G.L. c. 258, § 10(c).  Count VIII will
thus proceed against officers Darling, Bassett and Martin in
their personal capacities only.

### c. IIED: Officers Darling, Bassett, Martin, Hart and McCaw (Count IX);

To succeed on a claim for intentional infliction of emotional distress, a plaintiff must demonstrate the following four elements: 1) the defendants intended or should have known that harm was likely to result from their conduct, 2) the conduct was "extreme and outrageous," "beyond all possible bounds of decency" and "utterly intolerable in a civilized community," 3) the defendants' actions caused the plaintiff emotional distress and 4) that distress was "severe" and "of a nature that no reasonable person could be expected to endure it." Agis v. Howard Johnson Co., 355 N.E.2d 315, 318-19 (Mass. 1976).

The Court agrees with the defendants that the factual record cannot support the plaintiff's allegations of IIED. With respect to Officers Hart and McCaw (who are not alleged to have participated in the assault and battery), the allegations supporting the IIED claim are limited to 1) bringing false disciplinary charges, 2) denying a continuance of the disciplinary hearing and 3) tampering with the evidence. Even assuming those allegations are true, Rose has not alleged, nor is there evidence to demonstrate, that the officers' actions were taken with the intent to cause Rose severe emotional distress. Rose has equally failed to show that those actions rise to the level of "extreme and outrageous" conduct that is "utterly intolerable in a civilized society." Agis, 355 N.E.2d at 319.

-24-

Rose's only argument opposing summary judgment is that "[r]easonable people can differ on whether the defendant's [sic] conduct was extreme and outrageous."

Although a somewhat closer call, Rose's IIED claim against Officers Bassett, Darling and Martin also lacks a sufficient basis in fact.  There is evidence suggesting that the officers engaged in actionable misconduct but Rose has not demonstrated that he suffered severe emotional distress as a result of the officers' actions.  Although reasonable persons can differ as to whether an alleged assault is "outrageous" and "beyond all possible bounds of decency," Rose's utter failure to adduce any evidence of emotional distress is fatal to his IIED claim.

### d.  Violation of the MTCA: Department of Corrections (Count X).

Count X of the plaintiff's complaint asserts a negligence claim against the DOC under the Massachusetts Tort Claims Act alleging a lack of proper training and supervision.  That claim is barred by the 11th Amendment which precludes suit against a state, or an agency thereof, unless the state has waived its sovereign immunity.  Will v. Mich. Dep't of State Police, 491 U.S. at 55; Edelman v. Jordan, 415 U.S. 651, 662-63 (1974) ("[A]n unconsenting State is immune from suits brought in federal courts by her own citizens").

The MTCA provides a limited waiver to the Commonwealth's sovereign immunity for negligent or wrongful acts of public employees, M.G.L. c. 258, § 2, but exclusively for suit in its own courts.  M.G.L. c. 258, § 3; <u>Irwin</u> v. <u>Commissioner of Dept. of Youth Services</u>, 448 N.E.2d 721, 725-28 (Mass. 1983) (holding that the MTCA contains neither express nor implicit consent by the Commonwealth to suit in federal courts).  Thus, the MTCA claim against the DOC cannot proceed in federal court.  <u>See Rivera</u> v. <u>Comm. of Mass.</u>, 16 F. Supp.2d 84, 87-88 (D. Mass. 1998) (dismissing MTCA claim against police officers because Commonwealth had not waived its immunity from suit in federal court).

**ORDER**

In accordance with the foregoing, defendants' motion for judgment on the pleadings or, in the alternative, for summary judgment (Docket No. 28) is,

1) with respect to Count II (Eighth Amendment claim) as to Officers Darling, Bassett and Martin, **DENIED**;

2) with respect to Count IV (Racketeer Influenced and Corrupt Organizations Act), **ALLOWED**;

3) with respect to Count V (conspiracy to violate civil rights), **ALLOWED**;

4) with respect to Count VII (Massachusetts Civil Rights Act), **ALLOWED**;

5) with respect to Count VIII (Assault and Battery) as to Officers Darling, Bassett and Martin, **DENIED**;

6) with respect to Count IX (Intentional Infliction of Emotional Distress), **ALLOWED**; and

7) with respect to Count X (Massachusetts Tort Claims Act), **ALLOWED**.

Because plaintiff has consented to the dismissal of Counts I, III and VI in their entirety, Counts IV and V as to defendants Dennehy and Rose and Counts II, VIII and IX as to the "unnamed correctional officers," the only remaining viable claims are Counts II and VIII against Officers Darling, Bassett and Martin (in their <u>personal</u> capacities only).

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated September 15, 2010